IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARILYNN B. AMMONS,        )
                                     )
           Plaintiff,         )
                                     )
           v.               )      CIVIL ACTION NO. 1:06cv909-CSC
                                     )
MICHAEL J. ASTRUE,          )
COMMISSIONER OF           )
SOCIAL SECURITY,          )
                                   )
          Defendant.     )

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff applied for disability insurance benefits pursuant to Title II of the Social Security Act,  42 U.S.C. §§ 401 et seq. and for supplemental security income benefits under Title XVI of the Social Security Act,  42 U.S.C. § 1381 et seq. alleging that she was unable to work because of a disability.  Her application was denied at the initial administrative level.  The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.  1986).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.   The case is now before the court for

---

[1]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

review pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3).  Based on the court's review of the

record in this case and the briefs of the parties, the court concludes that the decision of the

Commissioner should be reversed and remanded to the Commissioner for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of
> not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential

evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

(1)      Is the person presently unemployed?
(2)      Is the person's impairment severe?
(3)      Does the person's impairment meet or equal one of the specific
impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4)      Is the person unable to perform his or her former occupation?
(5)      Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either
> to the next question, or, on steps three and five, to a finding of
> disability.  A negative answer to any question, other than step
> three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.**  The plaintiff was 57 years old at the time she applied for benefits, (R. 72) and 62 years old at the time of the hearing before the ALJ. (R. 354). She has a high school education. (R. 38, 107, 160 & 355). Her prior work experience includes work as a bookkeeper and poultry processor. (R. 37). Following the administrative hearing, the ALJ concluded that the plaintiff has severe impairments of "right thumb trapezial metacarpal arthritis, status post arthroplasty; osteoporosis; carpal tunnel syndrome; osteoarthritis; and a

history of CVA."  (R. 38).  The ALJ concluded that the plaintiff could return to her past relevant work as a bookkeeper.  (*Id*.)  Consequently, the ALJ concluded that the plaintiff was not disabled.

**B.  Plaintiff's Claims.**  The plaintiff presents two issues for the Court's review.  As stated by the plaintiff, the issues are as follows:

1.    The Commissioner's decision should be reversed, because the ALJ's residual functional capacity finding is not supported by substantial evidence.

2.    The Commissioner's decision should be reversed, because the ALJ's hypothetical question posed to the vocational expert failed to include the limitations imposed by Ms. Ammons' pain.

(Pl's Br. at 12).

## IV.  Discussion

A disability claimant bears the initial burden of demonstrating an inability to return to her past work.  *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990).  In determining whether the claimant has satisfied this burden, the Commissioner is guided by four factors: (1) objective medical facts or clinical findings, (2) diagnoses of examining physicians, (3) subjective evidence of pain and disability, e.g., the testimony of the claimant and her family or friends, and (4) the claimant's age, education, and work history.  *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983).

**1.    Residual Functional Capacity Finding**.  In this case, Ammons had four

consultative evaluations.  Dr. Vijay Vyas conducted an examination on November 14, 2000.

(R. 224-226).  Dr. Mark Ellis conducted an examination on April 27, 2004.  (R. 275-279).  Dr.

David Arnold conducted an examination on June 29, 2004.  (R. 288-289).  Dr. Arnold also

completed a physical capacities evaluation form and a clinical assessment of pain form.  (R.

290-291).  On October 25, 2004, Dr. Ellis performed a second examination after which he

competed a Medical Source Opinion (Physical) form.  (R. 294-303).  On May 27, 2005, Dr.

Bruce Williams, Ammons' treating physician, completed a physical capacities evaluation form

as well as clinical assessment of pain form.

  Ammons contends that the ALJ improperly credited Dr. Ellis' medical source opinion

to determine her residual functional capacity because Dr. Ellis' opinions were "based primarily

on [her] subjective complaints," and thus, were not supported by substantial evidence.  (Pl's

Br. at 14-15).  The ALJ determined that

> [w]hen the claimant's impairments and her pain are considered, it is clear that
> she is able to perform work activities at the light and sedentary levels of
> exertion.  Specifically, the Administrative Law Judge finds that the claimant is
> physically capable of sitting for one hour at a time up to a maximum of four to
> six hours during an eight hour workday; standing for 30 to 45 minutes at a time,
> up to a maximum of three hours during an eight hour workday; and walking for
> 10 to 15 minutes at a time up to a maximum of one to one and one-half hours
> during an eight hour workday.  She is capable of frequently lifting and carrying
> up to 15 pounds and occasionally lifting and carrying up to 30 pounds.  She can
> occasionally use her arms and legs for pushing and pulling.   She can
> occasionally climb, balance, stoop, kneel, crouch, crawl, handle, finger, and
> reach overhead.  She can frequently feel, talk, and hear.  She is restricted from
> activities involving proximity to moving parts and working in high, exposed
> places.  She can occasionally work in the following environments:  extreme
> cold, extreme heat, wetness/humidity, vibration, exposure to fumes, noxious
> odors, dust, mists, gases or poor ventilation, and driving automotive equipment.

(R. 32).

The ALJ concluded that the plaintiff could perform work at the light and sedentary levels, (R. 36-37) and determined that she could perform her past relevant work as book keeper because that work is performed at the light exertional level.  (R. 32).  The medical evidence fully supports his conclusion.

In February 1999, Ammons presented to Dr. Steven Beranek of Wiregrass Orthopaedics seeking treatment for a fractured left ankle.  (R. 180-81).  Dr. Beranek surgically repaired the ankle.  (*Id*. at 182).

On March 16, 1999, Ammons presented to Dr. Karen Mockler complaining about pain in her fingers.  (R. 197-198).  Dr. Mockler noted that

> she has problems with pain in the PIP and DIP joints of the fingers, knots are developing.  She has had a fracture of the left ankle, of course, that is still painful, wearing a splint at this time, and in general when she wakes up in the morning, she is very stiff and swollen in her hands, but after she gets going it gets better.

(R. 198).

Dr. Mockler's assessment included osteoporosis and osteoarthritis.  (R. 198).  She referred Ammons for a  mammogram and a bone density scan.  (R. 187-88 & 202).  The bone density scan revealed "definite osteoporosis . . . notable in the spine."  (R. 188).  Dr. Mockler prescribed Fosamax.  (R. 196).

On June 7, 1999, Ammons presented to Dr. Lassiter complaining of "bilateral thumb numbness" and pain and numbness in two fingers.  (R. 208).  Dr. Lassiter suspected bilateral

carpal tunnel syndrome, prescribed Anaprox and wrist splints, and referred Ammons for a nerve conduction study. (*Id.*). A nerve conduction study on June 8, 1999, confirmed bilateral carpal tunnel entrapments. (R. 209). On June 14, 1999, Ammons reported to Dr. Lassiter that the Anaprox helped, and that she wanted conservative treatment. (R. 208). Dr. Lassiter prescribed Celebrex and bilateral wrist splints. (*Id.*). On June 24, 1999, Ammons informed Dr. Lassiter that she was taking Celebrex, wearing her wrist splints, and "overall is doing better but still has some numbness and tingling." (R. 207). Dr. Lassiter referred Ammons to Dr. Callahan to discuss her surgical options. (*Id.*)

Ammons underwent testing with Dr. Callahan, who confirmed her diagnosis of bilateral carpal tunnel syndrome. (R. 211-212). Although Dr. Callahan expressed some concern regarding "mild APB atrophy in the left hand," Ammons elected to continue conservative treatment. (*Id.*). Dr. Callahan's treatment note of July 21, 1999 indicates that Ammons' pain and nocturnal paresthesia "has resolved." (R. 213).

On September 1, 1999, Ammons presented to Dr. Callahan complaining of numbness, tingling and pain in her right thumb. (R. 223). On October 18, 1999, Dr. Callahan noted that Ammons had "tenderness over the right thumb trapezial metacarpal joint with grossly positive grind maneuver." (R. 222). On November 9, 1999, Ammons underwent surgery to correct her right thumb. (R. 216-217). Dr. Callahan performed a "[r]ight trapezial excision and Zancolli arthroplasty" of her right thumb to relieve "trapezial metacarpal arthritis." (R. 217). Six weeks after her surgery, she was "doing quite well." (R.221). On February 8, 2000, Dr. Callahan noted that Ammons "achieved an excellent result" from her surgery. (R. 220).

7

Ammons underwent her first physical consultative evaluation by Dr. Vyas on November 14, 2000.  (R. 224-226).  Dr. Vyas noted that Ammons did not appear to "be in any pain or distress."  (R. 225).  Dr. Vyas' examination revealed the following:

> The cervical spine is normal.  The shoulders and elbows are normal.  The patient has vague tenderness on the palmar side of both the wrists on percussion but it is not that tender.  The patient has a scar on the right thumb on the medial side where the patient had surgery and the thumb is slightly painful but not very remarkable.  The patient has stiffness in the right interphalangeal joint, the middle interphalangeal joint because of previous injury about five years ago. The left hand shows that she has prominence of the metacarpal joint on the left thumb, it is more like it is protruding out rather than any deformity.  The patient can flex the thumb and extend but it is somewhat painful and the swelling goes down on trying to put pressure that would make it go inside.  The rest of the fingers are normal.  The grips are Grade IV/V bilaterally.  There is no tenderness of the dorsal or lumbar spine.  Leg raising at the hip pulses are normal.  The patient does have deformities of the right toes.  They are sort of partially flexed in a contracture position.  She says she has had that ever since she had a stroke 25 years ago.  Her right foot is slightly laterally rotated.  She walks slowly with a slight limp though she does not need the use of any cane or walker.  She cannot balance herself on walking on the toes or heels.  She can bend forward, backward, sideways normally.  She can squat normally without any pain or restriction.

(R. 226).  Dr. Vyas' impressions included "[b]ilateral carpal tunnel syndrom with deformities of the left thumb and the right little finger."  (*Id*.).

On February 6, 2003, Ammons presented to the Enterprise Medical Clinic complaining that she had tripped and hurt her right foot.  (R. 259).  X-rays revealed a calcaneus fracture. (*Id*.).  A follow-up examination revealed good healing with minimal tenderness.  (R. 257).

On April 27, 2004, Ammons underwent a physical consultative examination by Dr. Mark Ellis.  (R. 275-279).  Her complaints included osteoporosis, carpal tunnel syndrome, and arthritis.  (R. 275).  Dr. Ellis noted "no atrophy or wasting . . . on any of the extremities."  (R.

8

276).  He observed "some arthritic changes of the DIP joints of both hands" but there was no concomitant inflammation.  (*Id*.).  Although she had crepitance of the knees,  she had good muscle strength and no joint laxity or effusion.  (*Id*.)  Her spine was not tender to palpation.  (*Id*.).  Dr. Ellis diagnosed arthritis, an old stroke, and carpal tunnel syndrome.  (R. 277).  He did not comment on Ammons' ability to work.  (*Id*.)

On June 29, 2004, Ammons had another physical consultation examination, this time by Dr. David Arnold.  (R. 288-293).  Ammons reported to Dr. Arnold that she suffered from arthritis and carpal tunnel syndrome.  (R. 288).  Dr. Arnold noted "diffuse arthritic changes of the knees with decrease range of motion and crepitus."  (R. 289).  He did not document any swelling at the knees.  (*Id*.).  Dr. Arnold also noted "mild diffuse tenderness and decrease range of motion" in her back.  (*Id*.)  He diagnosed Degenerative Joint Disease.  (*Id*.)  Dr. Arnold opined that her "ability to carry out normal daily activities are (sic) limited and is not likely to improve."  (*Id*.)  Dr. Arnold also completed a physical capacities evaluation form and a clinical assessment of pain form.  (R. 290-291).  On the physical capacities evaluation, Dr. Arnold indicated that Ammons could lift 10 pounds occasionally and 5 pounds frequently, and could sit and stand or walk for two hours.  He described her as suffering from diffuse arthritis and opined that she was likely to be absent from work more than four days per month due to her condition.  (R. 290).  He also opined  that her pain was "present to such an extent as to be distracting" when performing daily activities or work and would "cause distraction from tasks," possibly resulting in abandonment.  (R. 291).  Finally, because Ammons was on no medication so she could perform job duties without any side effects impacting her ability to work.  (*Id*.).

9

On October 25, 2004, Dr. Ellis performed a second physical consultative examination of Ammons.  (R. 294-303).  She complained of osteoporosis, carpal tunnel syndrome, and arthritis.  (R. 294).  In particular, she alleged that the condition of her hands and legs had worsened due to her arthritis.  (*Id*.)  She also complained of "constant pain."  (*Id*.).  Dr. Ellis conducted a thorough examination which revealed the following.

> **UPPER EXTREMITIES**:  On the upper extremities, it is noted that the patient has a positive Tinel's sign bilaterally.  The patient also complains of pain in the arms when we do the muscle strength testing of both arms, but muscle strength testing is normal (5/5) in both upper extremities. . . . Patient has normal grip strength bilaterally and normal pinch strength bilaterally.  There is no atrophy or wasting noted.  The patient does have nodularity of the DIP joints of multiple fingers of both hands and the right fifth finger at the TIP joint remains flexed at 90 degrees. . . . The patient is also noted to have some crepitus in both shoulders.  The patient is able to make a fist with both ands and oppose the thumb to the ends of all fingers. . . . Claimant is able to manipulate objects with both hands. . . .
>
> **DORSOLUMBAR SPINE**:  No kyphosis or scoliosis noted.  No muscle spasms or tenderness noted on palpation. . . .
>
> **LOWER EXTREMITIES**:  Patient walks with a limp favoring the right leg.  She does not use a cane or assistance device.  She is able to toe and heel walk, but unable to squat.  On visual examination, it appears the patient has a little bit of a slight valgus deformity of the right knee with standing.  The patient is also noted to have crepitus in both knees, but worse on the right than the left.  Patient has normal muscle strength in all muscles of the left leg and the left foot, as well as having normal muscle strength in the right leg when tested in the thigh muscles.  However, when we do dorsiflexion and plantar flexion of the foot, I would rate her a little bit weak on this side with this being a 4/5 on muscle strength in doing these maneuvers.  DTR's are 2.4 on the left and 3/4 when tested at the patella on the right side.[4]  There is no edema or ulceration noted on the lower extremities.  There is no redness or swelling, or increased warmth of any of the joints. . . . There are no varicosities on the lower extremities. . . . Claimant has a negative seated and supine straight leg raise bilaterally.

(R. 296) (footnote added).  Dr. Ellis also ordered and reviewed a number of x-rays.

---

[4]  DTR is the medical abbreviation for deep tendon reflexes.

**X-RAYS**: X-rays were obtained of multiple joints, the first ones being of both the right and left hands in both AP and lateral views.  On these x-rays, there appears to be some loss of joint space more prominently of the DIP joints, specifically in the right hand of the pointing, middle and ring fingers.  There appears to be a little bit of destruction of these joints at these areas.  Also, this is noted in the DIP joint of the pointing and middle fingers of the left hand.  On these joints, there is decreased joint space, there is nodularity at the end of the bone and with what appears to be some displacement of the bone distal to the DIP joint in the left pointing finger.  On the PIP joint of the fifth finger of the right hand, there appears to be some destruction of this joint with the joint space completely occluded.  There is marked increase of the bone both proximal and distal to this joint.  On the lateral films of the left hand, I just still continue to see this destruction and decrease in joint space at the DIP joints of the pointing, middle and ring fingers.  On the lateral film it appears the patient has some early changes in the DIP joint of the pinky finger also.

X-rays were also obtained of the right and left feet.  On these, it appears that there is decrease in bone density.  There is also lateral deviation of the toes on both feet at the MTP joints, more prominent on the left foot than the right.  The joint spaces appear to be fairly well preserved at the MTP joints, however, there is beginning build-up of bone at the distal portion of the metatarsals in multiple areas. . . . I do not see any decrease in joint space between the talus or calcaneus or other bones of the proximal foot, neither in the right nor the left foot.

X-rays were obtained of the left ankle. . . . I do not see any changes in the mortis of the ankle.  I do not see any fractures or spurring. . . .

X-rays were also obtained of the right ankle in both AP and lateral views.  On these views, there is normal alignment.  The mortis appears to be intact and I see no displacements, no fractures, and no abnormalities.

X-rays were also obtained of both knees.  These were weight-bearing views.  On both of these, there is a slight decrease in joint space noted when the AP x-rays are viewed.  This appears to be more prominent on the lateral side.  This is on both the left and the right knees.  The patient does appear to have a little bit of a valgus deformity of the right knee.  There is no bone-on-bone contact.  On the lateral view of the left knee, I see no fractures and no displacements.  On the lateral view of the right knee, there does appear to be some osteophyte formation off the upper portion of the patella, but I see no other abnormalities.

(R. 297-298).  Ammons' effort during testing was good.  (R. 298).

Dr. Ellis completed a medical source opinion form in which he indicated that Ammons could stand for 30 - 45 minutes at a time, walk for 10 - 15 minutes at a time, and sit for 1 hour at a time.  (R. 299).  He indicated that she could stand for a total of 3 hours per day, walk for 1 - 1.5 hours per day, and sit for 4 - 6 hours per day.  (*Id*.)  He also indicated that she could lift and carry 5 - 10 pounds constantly, 15 pounds frequently, and 30 pounds occasionally.  (*Id*.).  At the end of the form completed by Dr. Ellis is a question: "Have you completed this form based primarily on the claimant's subjective complaints."  In response to this question, Dr. Ellis checked the "Yes" box.  (R. 301.)

Ammons argues that Dr. Ellis' opinions are not supported by substantial evidence because "his opinions are in direct opposition to the medical opinions expressed by Drs. Williams and Arnold."  (Pl's Br. at 13).  According to Ammons, "[t]he weight of the evidence shows that [she] could not perform the physical demands as found by the ALJ including the postural and lifting restrictions."  (*Id*. at 140).

Contrary to Ammons' assertion that Dr. Ellis relied relied "primarily on the claimant's subjective complaints" to reach on his conclusions regarding her limitations, a review of his report demonstrates that he relied on his two consultative examinations, x-ray interpretation and range of motions studies to complete the residual functional capacity form.  The ALJ accorded more weight to the opinion Dr. Ellis because he examined the plaintiff on two separate occasions and "his opinion is consistent with the other medical evidence contained in the record."  (R. 32).  The court agrees.  The evidence in the record supports the ALJ's findings regarding the plaintiff's residual functional capacity.  Although Drs. Williams and

12

Arnold opined that the plaintiff could sit and walk/stand for 2 hours, Dr. Ellis opined that Ammons could sit for 4-6 hours, stand for 3 hours, and walk for 1 and ½ hours.  A review of the ALJ's decision demonstrates that the ALJ conducted a thorough analysis of the testimony and considered all of the objective medical evidence in reaching his decision.  While Dr. Ellis indicated on a form that he "completed . . . [the] form" based on Ammon's subjective complaints, the record of his examinations shows otherwise.

This court must accept the factual findings of the Commissioner if they are supported by substantial evidence and based upon the proper legal standards.  *Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  After carefully considering the evidence of record, including those portions potentially conflicting with or detracting from the Commissioner's decision, the court concludes that the Commissioner's decision is due to be affirmed.

**2.      Questioning of the Vocational Expert**.  Nonetheless, the court concludes that a remand is necessary because the ALJ erred, as a matter of law.  The plaintiff contends that the ALJ's conclusion that she could perform light work was erroneous because it was based upon improper hypotheticals to the vocational expert.  Specifically, Ammons complains that in questioning the vocational expert, the ALJ failed to include the limitations created by Ammons' pain.

"When the ALJ uses a vocational expert, the ALJ will pose hypothetical question(s) to the vocational expert to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national

economy." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  A vocational expert's testimony is fatally deficient if the ALJ's hypothetical questions fail to precisely set out all of the claimant's impairments.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  *See also Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980) (citing with approval *Stephens v. Secretary of Health, Ed. and Welfare*, 603 F.2d 36, 41 - 42 (8th Cir. 1979).

At the administrative hearing, in formulating his hypotheticals to the vocational expert, the ALJ used the following language:

> . . . if I find that this is a fair assessment of her ability to do basic
> work activities, could she do her past relevant work?

(R. 368-369).  In each hypothetical, the ALJ refers to specific exhibits in the file, including physical evaluation forms.  (*Id.*).  However, the ALJ never defines for the vocational expert what he considers to be the plaintiff's medical limitations or functional restrictions nor does he describe what he considers to be "basic work activities."  The ALJ's questioning of the vocational expert is so vague, the court cannot determine whether the ALJ and vocational expert had the same understanding of Ammons' ability to do basic work activities or even whether they shared the same understanding of Ammons' limitations.

In *Brenem v. Harris*, 621 F.2d 688 (5th Cir. 1980), the ALJ failed to include psychological limitations in the hypothetical questions posed to the vocational expert.  The district court concluded that because the medical records referenced Brenem's psychological limitations, the ALJ's questions were sufficient.  The Fifth Circuit Court of Appeals reversed.

14

> We do not think it is proper to assume that because the vocational expert was aware of Brenem's psychological problems, that he took them into consideration in answering hypothetical questions which referred only to physical impairments. Or at least we have no basis for assuming that had these factors been included in the hypothetical questions his answers would have been the same.

*Id.* at 690.

The court's concern is applicable here. Because the ALJ did not comprehensively describes Ammons' impairments, the court declines to assume what limitations the vocational expert actually considered in determining that she could perform work. This error is particularly a problem where the plaintiff asserts pain as a basis for disability, since even mild or moderate pain may prevent a claimant from engaging in a range of work for which the plaintiff is otherwise qualified. The court may not assume that the vocational expert was aware of the ALJ's determination of the level of pain suffered by the plaintiff or to what extent the vocational expert took Ammons' pain into consideration in answering the hypothetical questions posed by the ALJ. *See generally Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985) (where hypothetical upon which vocational expert based his testimony did not assume claimant's anxiety or depression, both of which the ALJ found to be severe impairments, ALJ's decision was unsupported by substantial evidence). The ALJ must consider every impairment alleged by the plaintiff and determine whether the alleged impairments are sufficiently severe - either singularly or in combination - to create a disability. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986). All of the plaintiff's impairments must be considered in combination, even when the impairments considered separately are not severe. *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985).

15

In his questioning of the vocational expert, the ALJ refers to "a fair assessment of her ability to do basic work activities." (R. 368-369). Unfortunately, the ALJ never explains or describes to the vocational expert the extent of the plaintiff's impairments or any restrictions her impairments may have on her ability to perform light and sedentary work. Accordingly, the court is forced to conclude that the ALJ erred, as a matter of law, by not fully explaining or describing all the plaintiff's impairments and restrictions in the hypothetical questions posed to the vocational expert. Thus, because of the ALJ's omission of relevant facts from his hypothetical to the vocational expert, this case must be remanded to the Secretary. Upon remand, the Secretary shall elicit vocational testimony based upon a complete and comprehensive description of the plaintiff's exertional and non-exertional impairments, as well as any restrictions she may have, in order to properly assess her disability claim.

The court stresses that a remand is necessary because the ALJ erred as a matter of law in questioning the vocational expert. This conclusion does not reflect, and should not it be considered to cast, any doubt on the ALJ's findings regarding the claimant's veracity and credibility. The court has reviewed the ALJ's determinations regarding the claimant's allegations and concludes that the ALJ did not err in discrediting her testimony. His findings are amply supported by substantial evidence in the record. Additionally, the court is not concluding that it is improper to frame hypothetical questions to a vocational expert by reference to exhibits in the case. *See e.g., Outlaw v. Barnhart,* 197 Fed.Appx. 825, 827-828 (11th Cir. 2006). However, in following this practice an ALJ must insure that the exhibits to which he refers encompass all of a claimants impairments. If they do not, the ALJ should give

further guidance to the vocational expert.

## V. Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 2nd day of November, 2007.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

17